MARK W. POE (BAR NO. 223714)
 mpoe@gawpoe.com
VICTOR MENG (BAR NO. 254102)
 vmeng@gawpoe.com
FLORA VIGO (BAR NO. 239643)
 fvigo@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA  94111
Telephone:  415-766-7451

Attorneys for Marcelo Muto and Noah Breeze

CALEB MARKER (BAR NO. 269721)
 caleb.marker@zimmreed.com
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Telephone: 877-500-8780
(Additional Counsel Identified Below)

Attorneys for John Doe 1 and John Doe 2

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCELO MUTO, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>FENIX INTERNATIONAL<br>LIMITED; FENIX INTERNET<br>LLC,<br><br>                    Defendants. | Case No. 5:22-cv-02164-SSS-KK<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS CONSOLIDATED COMPLAINT**<br><br>Judge:       Hon. Sunshine S. Sykes<br>Courtroom:  Courtroom 2<br>Date:        August 11, 2023<br>Time:        2:00 pm |

1

## <u>**TABLE OF CONTENTS**</u>

2

3

INTRODUCTION ................................................................. 1

I.   THE FORUM SELECTION AND CHOICE OF LAW CLAUSES ARE UNENFORCEABLE. ........................................................ 4

A.   Enforcing the Forum Selection and Choice of Law Clauses Would Contravene California Public Policy. ..................................... 4

1.   Litigation in England or Wales would foreclose a class action. ........... 5

2.   There is no analogue to the ARL in English law. ............................ 7

3.   Defendants' offer to stipulate to have an English court apply the ARL and UCL does not resolve the issue. .................................. 9

4.   Neither Mr. White nor Defendants' brief identifies any analog to California's "Public Injunction." ........................................10

5.   California Has a Materially Greater Interest in the Determination of the Dispute. ...................................................................11

II.   BOTH DEFENDANTS ARE SUBJECT TO SPECIFIC JURISDICTION IN CALIFORNIA. ....................................................................12

A.   Plaintiffs' Claims "Arise Out Of" Defendants' Forum-Related Activity. 13

B.   Defendants Have Consummated Tens of Thousands of Contractual Transactions with California Residents Over the Last Four Years ...........14

1.   Alternatively, Defendants purposefully availed themselves of the privilege of conducting business in California. ...............................16

III.   PLAINTIFFS' ALLEGATIONS ESTABLISH THEIR STANDING. ............19

IV.   PLAINTIFFS HAVE STATED A CLAIM AGAINST FENIX INTERNET. ..21

OPP. TO MOT. TO DISMISS CAC
CASE NO. 5:22-CV-02164-SSS-KK

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Federal Cases**

*Albertazzi v. Albertazzi*,
 2018 WL 457267 (D. Nev. Jan. 17, 2018)...........................................................15

*Ariix, LLC v. NutriSearch Corp.*,
 2022 WL 837072 (S.D. Cal. Mar. 21, 2022) ......................................................17

*Boschetto v. Hansing*,
 539 F.3d 1011 (9th Cir. 2008).....................................................................18, 19

*Brazil v. Dell Inc.*,
 2010 WL 8816312 (N.D. Cal. Mar. 29, 2010)......................................................1

*Caces-Tiamson v. Equifax*,
 2020 WL 1322889 (N.D. Cal. Mar. 20, 2020)....................................................17

*Compound Sols., Inc. v. CoreFX Ingredients, LLC*,
 2020 WL 3639663 (S.D. Cal. July 6, 2020) .........................................................5

*Davis v. Cranfield Aerospace Sols., Ltd.*,
 __ F.4th __, 2023 WL 4141670 (9th Cir. June 23, 2023) ................. 12, 13, 14, 16

*Derosa v. Thor Motor Coach, Inc.*,
 No. 22-CV-04895-SVW-PLA, 2020 WL 6647734 (C.D. Cal. Sept.
 30, 2020)..............................................................................................................10

*Dole Food Co. v. Watts*,
 303 F.3d 1104 (9th Cir. 2002)............................................................................17

*Elliot v. Cessna Aircraft Co.*,
 2021 WL 2153820 (C.D. Cal. May 25, 2021) ....................................................17

*Ford Motor Co. v. Mont Eighth Judicial Dist. Court*,
 141 S. Ct. 1017 (2021).......................................................................................16

*FT Travel--New York, LLC v. Your Travel Ctr., Inc.*,
 112 F. Supp. 3d 1063 (C.D. Cal. 2015) ...............................................................7

*Herbal Brands, Inc. v. Photoplaza, Inc.*,
 __ F.4th __, 2023 WL 4341454 (9th Cir. July 5, 2023) ................................15, 17

*Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*,
    485 F.3d 450 (9th Cir. 2007) ...........................................................................17

*Imageline, Inc. v. Hendricks*,
    2009 WL 10286181 (C.D. Cal. Aug. 12, 2009) ...........................................18, 19

*King v. Bumble Trading, Inc.*,
    393 F. Supp. 3d 856 (N.D. Cal. 2019) ................................................. 2, 5, 9, 11

*Kissel v. Code 42 Software, Inc.*,
    No. 15-cv-01936-JLS, 2016 WL 7647691 (C.D. Cal. Apr. 14, 2016) ....... 1, 2, 5, 9

*Liggett v. Utah Higher Educ. Assistance Auth.*,
    No. 19-CV-01589-JLS-ADS, 2020 WL 1972286 (C.D. Cal. Feb. 3,
    2020) .................................................................................................................17

*Marasigan v. MidFirst Bank*,
    2023 WL 3470128 (S.D. Cal. May 15, 2023) ...................................................20

*In Re Packaged Seafood Products Antitrust Lit.*,
    338 F. Supp. 3d 1118 (S.D. Cal. 2018) .............................................................17

*Parrella v. Salient Arms Int'l Inc.*,
    2020 WL 473794 (D. Ariz. Jan. 29, 2020) .......................................................15

*Riggins v. Bank of Am., N.A.*,
    No. 12-CV-0033-DOC, 2013 WL 319285 (C.D. Cal. Jan. 24, 2013) .................21

*Rogers v. Lyft, Inc.*,
    452 F. Supp. 3d 904 (N.D. Cal. 2020) ..............................................................10

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ............................................................................16

*Stomp, Inc. v. NeatO, LLC*,
    61 F. Supp. 2d 1074 (C.D. Cal. 1999) ..............................................................19

*Travelers Health Ass'n v. Commonwealth of Va.*,
    339 U.S. 643 (1950) .....................................................................................2, 18

*Vargas v. JP Morgan Chase Bank, N.A.*,
    30 F. Supp. 3d 945 (C.D. Cal. 2014) ................................................................19

OPP. TO MOT. TO DISMISS CAC
CASE NO. 5:22-CV-02164-SSS-KK

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) .................................................................... 2, 7

*Walden v. Fiore,*
   571 U.S. 277 (2014) ......................................................................... 17

*Wong v. Las Vegas Sands Corp.,*
   2022 WL 902419 (E.D. Cal. Mar. 28, 2022) .................................... 15

*Yamashita v. LG Chem, Ltd.,*
   62 F.4th 496 (9th Cir. 2023) ....................................................... 3, 14

*Yei A. Sun v. Advanced China Healthcare, Inc.,*
   901 F.3d 1081 (9th Cir. 2018) ............................................................ 5

**California Cases**

*America Online, Inc. v. Superior Court of Alameda County (Mendoza),*
   90 Cal. App. 4th 1 (2001) ......................................................... *passim*

*Carter v. City of Los Angeles,*
   224 Cal. App. 4th 808 (2014) ....................................................... 2, 7

*McGill v. Citibank, N.A.,*
   2 Cal. 5th 945 (2017) ...................................................... 2, 9, 10, 11

**Foreign Cases**

*Convoy Collateral Ltd v Broad Ideas International*
   [2023] ............................................................................................ 11

*Lloyd v. Google,*
   [2021] .......................................................................................... 6, 7

**California Statutes**

Cal. Bus. & Prof. Code
   § 17203 ......................................................................................... 22
   § 17204 ......................................................................................... 20
   § 17602(a)(2) ..................................................................... 3, 21, 22

## INTRODUCTION

Fenix International Limited ("FIL") and Fenix Internet LLC ("Fenix") move to dismiss the Consolidated Class Action Complaint (ECF No. 34, hereafter "CAC") on four grounds. None has merit.

*First*, Defendants seek to enforce the forum selection and choice of law clauses in their online Terms that would require Plaintiffs to bring their claims under English law in the courts in England and Wales. But they stumble right out of the gate by failing to cite dispositive authority from the Ninth Circuit. In *Doe 1 v. AOL, LLC*, a putative class of California consumers sued AOL under California consumer protection laws, as Plaintiffs do here. 552 F.3d 1077, 1079 (9th Cir. 2009) (hereafter "*AOL*"). Like Defendants here, AOL moved to dismiss by invoking the forum selection clause in its member agreement, which required application of the laws of Virginia to "any claim or dispute," and vested "exclusive jurisdiction" in "the courts of Virginia." *Id.* at 1080. The Ninth Circuit set forth the operative rule: "[A] forum selection clause [is] unenforceable 'if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute *or by judicial decision*.'" *AOL*, 552 F.3d at 1083 (citing *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 17 (1972)). Applying that rule, it recognized that California has declared "by judicial decision" that "California public policy [] strongly favors consumer class actions." *Id.* at 1083 (citing *America Online, Inc. v. Superior Court of Alameda County (Mendoza)*, 90 Cal. App. 4th 1, 15 (2001)).

Indeed, "[t]he unavailability of class action relief in this context is sufficient in and by itself to preclude enforcement of the TOS forum selection clause." *Mendoza*, 90 Cal. App. 4th at 18; *see also Brazil v. Dell Inc.*, 2010 WL 8816312, at *7 (N.D. Cal. Mar. 29, 2010) (noting that "courts have recognized this right to seek class action relief in consumer cases as a fundamental public policy of California[.]"). Beyond that, courts have found that the ARL itself is a fundamental California policy. *See Kissel v. Code 42 Software, Inc.*, No. 15-cv-01936-JLS, 2016

WL 7647691, at *5 (C.D. Cal. Apr. 14, 2016) (holding that the ARL reflects a *fundamental* policy of California.); *King v. Bumble Trading, Inc.*, 393 F. Supp. 3d 856, 868 (N.D. Cal. 2019) ("the Renewal Law nonetheless represents a fundamental public policy"). The same is true for Plaintiffs' request for public injunctive relief. *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 951 (2017).

Defendants do not mention *AOL*, *Mendoza*, *Kissel*, *King*, or *McGill* because they are impossible to meaningfully distinguish. The most Defendants can do is offer the opinion of an English barrister who suggests that an English court *might* be willing to disregard the Terms' specification that "English law will apply to [ ] any claim that you have," and who describes an English procedural mechanism that is vaguely similar to a class action. *See* Decl. of Antony White ¶¶24, 47. But the *possibility* that an English court would enforce the ARL against Fenix is cold comfort, and the "Group Litigation" device Mr. White describes is not remotely like Rule 23. In particular, the very English Supreme Court case Mr. White references explains that "the rule does not confer a right to opt out of the proceedings." *Lloyd v Google LLC*, ¶77 [2022] AC 1217 (submitted herewith as Ex. A to Pls.' Request for Judicial Notice ("RJN")); White Decl. ¶46 (citing *Lloyd*). Both California courts and the Supreme Court recognize that the lack of an opt-out right "violate[s] due process." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011); *Carter v. City of Los Angeles*, 224 Cal. App. 4th 808, 826 (2014). It is hard to imagine a more fundamental policy than the right to due process.

*Second*, Defendants' contention that the Court lacks personal jurisdiction over them is fatally flawed. Plaintiffs allege that Defendants purposefully availed themselves of the privilege of doing business in California by entering automatically renewing contracts with themselves and thousands of other California consumers. CAC ¶¶23-24. A defendant purposefully avails itself of a forum if it creates "continuing relationships and obligations" with citizens of that state. *Travelers Health Ass'n v. Commonwealth of Va.*, 339 U.S. 643, 647 (1950). Defendants'

contention that Plaintiffs' claims do not "arise out of" those contracts is non-sensical. Plaintiffs' claims would not even exist "but for" Defendants' contracting activities in California, which is all that is required under the *only* case Defendants cite in support of this argument. *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504 (9th Cir. 2023).

*Third*, Defendants' challenge to Plaintiffs' standing is similarly meritless. Plaintiffs' allegations show economic injury caused by Defendants' failure to comply with the ARL. The CAC alleges that Plaintiffs lost money in the form of automatic renewal fees, which they would not have lost had Defendants made the clear and conspicuous disclosures and provided the post-subscription acknowledgments required by the ARL. CAC ¶¶79, 83, 86-90, 93-97. Defendants seek to introduce evidence to show that Plaintiffs "knew" that their subscriptions would renew. Mot. at 18-21. But they cite no authority suggesting that such "knowledge" immunizes a defendant from liability under the "unlawful" prong of the UCL in an ARL enforcement action. This is because (as far as our research reveals) there is no such authority. Even then, the most that can be made from the individual Plaintiffs' transaction histories are *inferences* about the state of their knowledge. But inferences are not to be drawn in the moving party's favor.

*Last*, Defendants seek dismissal of Plaintiffs' claim against Fenix by contending that Fenix was not involved in drafting or making the inadequate disclosures. Mot. at 22. Defendants cite zero authority that that fact (assuming it is true) gets Fenix off the hook, where the ARL makes it independently "unlawful" to "charge the consumer's credit or debit card" while in derogation of the ARL's requirements. Cal. Bus. & Prof. Code § 17602(a)(2). Plaintiffs allege, CAC ¶19, and Defendants agree, Taylor Decl. ¶6, that Fenix is the entity that "charge[s] the consumer's credit or debit card." *Id.* § 17602(a)(2).

The Court should deny Defendants' motion to dismiss in its entirety.

OPP. TO MOT. TO DISMISS CAC
CASE NO. 5:22-CV-02164-SSS-KK

## I.    THE FORUM SELECTION AND CHOICE OF LAW CLAUSES ARE UNENFORCEABLE.

"[A] forum selection clause is unenforceable 'if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute *or by judicial decision*.'"  *AOL*, 552 F.3d at 1083 (quoting *M/S Bremen*, 407 U.S. at 17).  In other words, "California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy."  *Mendoza*, 90 Cal. App. 4th. at 12.

### A.    Enforcing the Forum Selection and Choice of Law Clauses Would Contravene California Public Policy.

In *AOL*, plaintiffs brought a class action alleging various violations of California consumer protection law.  552 F.3d at 1078.  Defendant moved to dismiss for improper venue, relying on forum selection and choice of law clauses requiring any action to be brought in Virginia under Virginia law.  *Id.* at 1079-80.  The district court granted the motion, but the Ninth Circuit reversed.  It held that "[a]s to such California resident plaintiffs, *Mendoza* holds California public policy is violated by forcing such plaintiffs to waive their rights to a class action and remedies under California consumer law."  *Id.* at 1084. Although the principal substantive claim discussed in *AOL* was the Consumer Legal Remedies Act ("CLRA") instead of the ARL, that distinction was not necessary to the outcome.  As previewed above, *Mendoza* noted that "[t]he unavailability of class action relief in this context is sufficient in and by itself to preclude enforcement of the TOS forum selection clause."  90 Cal. App. 4th at 712.

Beyond the class aspect, just as the substantive law at issue in *Doe/Mendoza* (the CLRA) embodied a strong public policy sufficient to deny dismissal, the substantive law at issue here (the ARL) does the same.  The only two courts to have considered whether the ARL is a fundamental policy of California have concluded

that it is. *See Kissel*, 2016 WL 7647691, at \*5 (C.D. Cal. Apr. 14, 2016) (denying dismissal because "the ARL reflects a *fundamental* policy of California.") (emphasis in original); *King*, 393 F. Supp. 3d at 868 (denying dismissal because "the Renewal Law nonetheless represents a fundamental public policy").

Defendants inaptly argue that a stand-alone UCL claim is insufficient to disregard a forum-selection clause. Mot. at 9. The only case Defendants site, *Compound Sols., Inc. v. CoreFX Ingredients, LLC*, 2020 WL 3639663, at \*5 (S.D. Cal. July 6, 2020), is inapposite because it was not a class action, so California's avowed strong public policy in favor of consumer class actions was not implicated. Moreover, the UCL claim was predicted on California's False Advertising Law ("FAL"), *id.* at \*1, and if there are cases holding that the FAL is a fundamental California policy, they were not mentioned. As *King* explained, "'[w]hether a UCL claim implicates fundamental California policy depends on the predicate violation.'" 393 F. Supp. 3d at 867 (quoting *Cardonet, Inc. v. IBM Corp.*, No. 06-cv-06637-RMW, 2007 WL 518909, at \*5 (N.D. Cal. 2007)). Both *King* and *Kissel* hold that the ARL *is* a fundamental California policy that cannot be waived.

Two additional issues presented by *King* and *Kissel* warrant mention. First, they concerned only choice-of-law clauses; the plaintiffs' chosen forum was not also threatened, as here. That distinction doesn't help Defendants, however, because "[courts] generally treat the analysis [of choice-of-law and forum-selection clauses] as coextensive." *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 n.4 (9th Cir. 2018). That this case concerns both the forum and governing law strengthens Plaintiffs' position, because while the *King* and *Kissel* plaintiffs would have been subject to a different body of substantive law, they still would have been entitled to class proceedings. Here, California's strong public policy favoring consumer class actions is *also* at stake. *See Mendoza*, 90 Cal. App. 4th at 18.

### 1. Litigation in England or Wales would foreclose a class action.

Defendants' alternative argument—that the two fundamental policies at issue

1   (the class action device and the substantive ARL) would be adequately protected if

2   this case were sent to England or Wales—is equally meritless.  First, Defendants do

3   not claim that U.S.-style class actions are available in England or Wales, because

4   they are not.  The closest alternatives are described in the White declaration, where

5   Mr. White asserts that "[i]n English law there are various procedures analogous to a

6   class action which the Plaintiffs could seek to deploy."  White Decl. ¶47.  But the

7   "procedures" he describes are not at all like a class action under Rule 23.  He first

8   references the possibility of "a Group Litigation Order under CPR 19.11."  *Id.*  This

9   is a non-starter, because as the England Supreme Court case that Mr. White

10  references explains, "the group action procedure suffers from the drawback that it is

11  an 'opt-in' regime: in other words, claimants must take active steps to join the

12  group."  *See* RJN Ex. A ¶25 (*Lloyd v. Google*, [2021] UKSC 50).  *Lloyd* also

13  describes various limitations of the group action procedure, including that "a

14  solicitor conducting the litigation has to obtain sufficient information from a

15  potential claimant to determine whether he or she is eligible," he or she must "enter

16  into a retainer with [each] client," and "the initial costs alone may easily exceed the

17  potential value of the claim."  *Id.*   *Lloyd* then explains how this device has been

18  unavailing where "the number of people affected is large and the value of each

19  individual claim relatively small," concluding that the procedure is "impractical in

20  [such] cases."  *Id.* ¶¶26-28. The Supreme Court of England does not share Mr.

21  White's optimism of trying Plaintiffs' class claims via a Group Litigation Order.

22      Again citing *Lloyd*, Mr. White proposes the possibility of "a representative

23  action under CPR 19.6 seeking declaratory relief to be followed by individual claims

24  for compensation."  White Decl. ¶47.  But *Lloyd* explains why that approach is

25  infeasible for these claims: "For claims which individually are only worth a few

26  hundred pounds, this process is not economic as the initial costs alone may easily

27

28

OPP. TO MOT. TO DISMISS CAC
CASE NO. 5:22-CV-02164-SSS-KK

exceed the potential value of the claim."[1]  RJN Ex. A ¶25.  Most importantly, a "representative action" under English law would impermissibly strip absent class members of their constitutional right to due process, because as *Lloyd* explains "[t]he rule does not confer a right to opt out of the proceedings."  RJN Ex. A ¶77; *see Dukes*, 564 U.S. at 363; *Carter*, 224 Cal. App. 4th at 826 (both holding that the absence of an opt-out right "violate[s] due process").  Maybe English courts have discretion to allow an opt-out process, but constitutional due process is too important to hinge on hopes of a favorable exercise of discretion.

In this second version of his declaration, Mr. White responds to certain arguments made in Plaintiffs' prior opposition brief, *see* White Decl. ¶¶48-56, but he does not dispute the foregoing description of *Lloyd*, or claim the group action proceeding provides the opt-out right that is fundamental to constitutional due process.  Such arguments should not be saved for the reply brief.[2]

## 2.    There is no analogue to the ARL in English law.

Even if England provided for a class device remotely similar to Rule 23(b)(3), which it does not, England has no analogue to the substantive provisions of the ARL. Mr. White opines that "English law provides for at least three corresponding causes of action," *id.* ¶31, but even superficial scrutiny shows that his three alternatives are nothing of the sort.   First, he says the "Consumer Contracts (Information, Cancellation and Additional Charges) Regulations 2013" "contains a set of pre-and post-contractual disclosure and notification protections comparable to (if not more

---

[1] We note that Plaintiffs' and the class members' claims are not "for a few hundred pounds," but range from $14.99 to $29.99.  CAC ¶¶ 79, 83.  And the claims of some members of the class will likely be even smaller.  The allegations relating to John Doe 1, for example, are based on a $3.89 monthly charge (although in his case they went unnoticed for multiple months, resulting in his personal claim amounting to $15.56).  *Id.* ¶¶ 89-90

[2] *See, e.g.*, *FT Travel--New York, LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015) ("Courts decline to consider arguments that are raised for the first time in reply.") (collecting citations).

stringent than) the California Automatic Renewal Law." *Id.* ¶31a.  He says that under "Regulation 13(1)" of that law, a "trader" is required to disclose the information set forth in "Schedule 2" "before a consumer is bound by a distance contract."  *Id.* ¶34.  Plaintiffs submit herewith the full text of that statute, which contains nothing remotely similar to the ARL.  RJN Ex. B.  Schedule 2 sets forth 24 different requirements, but the only one that concerns a "subscription" service says only that the "trader" must state "the total costs per billing period."  *Id.* at 23 (sub. (h)).  Plaintiffs' claim is not that Defendants failed to disclose the monthly cost, but that Defendants (A) failed to conspicuously disclose that the cost would be *automatically* recurring as the ARL requires, (B) charged Plaintiffs for the automatic renewals without their affirmative consent, (C) failed to provide the confirming email documenting those details, and (D) failed to provide a "prominently located" cancellation button.  CAC ¶¶6-7, 72-75.  Moreover, as Mr. White forthrightly explains, Plaintiffs' only relief under this "corresponding causes of action" would be for "breach of contract."  White Decl. ¶39.  That is completely unhelpful, where Plaintiffs' claim is not that Defendants breached their contract (*i.e.*, the Terms), but that they did not comply with the ARL, which bind Defendants regardless of any "breach."

The second and third "corresponding causes of action" identified by Mr. White are also entirely non-responsive to Plaintiffs' claim.  His second idea refers to a law in England "similar to the California Unfair Competition Law." White Decl. ¶31b.  But Plaintiffs are not seeking to enforce the UCL in the abstract, but to enforce the ARL itself.  His third reference is to the "Consumer Rights Act 2015," but by Mr. White's own description, the "most relevant provisions" of that statute require only that "digital content will match any description of it given by the trader to the consumer," and that any information the trader provides "is to be treated as included as a term of the contract."  *Id.* ¶41.  Like the others, those provisions simply have no bearing on the conduct that is the subject of Plaintiffs' claims.

Finally regarding the substitutability of English law, it should be noted that both *King* and *Kissel* held that even other *states'* "corresponding causes of action," White Decl. ¶31, were insufficiently protective of the fundamental ARL rights of California consumers. *King*, 393 F. Supp. 3d at 868-69; *Kissel*, 2016 WL 7647691, at *4.

### 3.    Defendants' offer to stipulate to have an English court apply the ARL and UCL does not resolve the issue.

In a footnote, Defendants make an additional argument to avoid the result that inevitably follows from *AOL*, *Mendoza*, *Kissel*, *King*, and *McGill*. They note that Section 16a of the Terms flatly proclaims that "[i]f you are a consumer, … English law <u>will apply</u> to (i) any claim that you have," but point to a later sentence that says "[y]ou <u>will also be</u> able to rely on mandatory rules of the law of the country where you live." *See* Mot. at 9 n.4; *see also id.* at 5 (replicating section 16a.) (emphasis added). They then "stipulate" that "if the Court concludes that either the UCL or ARL creates non-waivable rights under California law, Plaintiffs will be able to rely on those statutes." *Id.* It is far from clear what a contract means when it says that one body of law "will apply," and that a different body of law "will also" apply. It is further hard to see how the ARL and UCL are "mandatory rules of the law of the country where [Plaintiffs] live," given that California is a state, not a "country". Indeed, Mr. White himself proclaims, "I have seen no indication that the Plaintiffs rely on any mandatory rule of the law of the country where they live." White Decl. ¶20.

Nevertheless, even accepting Mr. White's (wholly conclusory) statement that "it is open to the parties to litigation before the English courts to agree on the law applicable to their dispute," *id.* ¶26, neither he nor Defendants' brief suggests that in addition to the substantive content of the ARL and the UCL, English courts would adopt the procedures of class adjudication set forth in Rule 23. In other words, while following the *substantive* content of the ARL and the UCL may take care of the

choice-of-law problem, it would do nothing to resolve the independently sufficient ground that "California public policy strongly favors consumer class actions." *AOL*, 552 F.3d at 1084.

In the same way, the *only* authority Defendants cite to support this "stipulation" argument is inapposite. That case, *Derosa v. Thor Motor Coach, Inc.*, No. 22-CV-04895-SVW-PLA, 2020 WL 6647734 (C.D. Cal. Sept. 30, 2020), was not a class action, so when considering whether a choice-of-law stipulation would address the plaintiff's venue concern, the court had no occasion to consider the significance of California's strong public policy in favor of protecting consumer class actions.

### 4.    Neither Mr. White nor Defendants' brief identifies any analog to California's "Public Injunction."

"The public injunction is a creature of California law that 'has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public.'" *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 919 (N.D. Cal. 2020) (quoting *McGill*, 2 Cal. 5th at 951). Public injunction under California law sharply contrasts with common law injunctive relief in that the requesting plaintiff need not "demonstrate any type of likely future injury." *Id.*; *cf. Bates v. United Parcel Serv.*, Inc., 511 F.3d 974, 985 (9th Cir. 2007) (noting that typical injunctive relief requires a plaintiff to couple an existing injury with "'a sufficient likelihood that he will again be wronged in a similar way.'"). A public injunction under California law "is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff," such that it will still appropriately issue where "the plaintiff has already been injured, allegedly, by such practices and is aware of them." *McGill*, 2 Cal. 5th at 955 (citation omitted, alteration accepted). California's Supreme Court has made it very clear that "a provision in *any* contract … that purports to waive … the statutory right to seek public injunctive relief under the UCL … is invalid and unenforceable." *McGill*, 2 Cal. 5th at 962.

Mr. White's declaration devotes several paragraphs to the issue of public injunctive relief, but nowhere addresses the key issue of whether English courts will issue injunctions where the plaintiff himself cannot show a likelihood that he will again be injured.  White Decl. ¶¶49-56.  The only English authority he cites suggests that they would not.  According to that precedent, "an injunction may only be granted to protect a legal or equitable right [which] signifies the need to identify an interest of *the claimant* which merits protection."  RJN Ex. C (*Convoy Collateral Ltd v Broad Ideas International* [2023] AC 389, ¶52) (emphasis added).  There is no indication either in that lengthy opinion or in Mr. White's declaration that English courts are willing to issue injunctions at the behest of a fully compensated claimant who desires to prevent the respondent from causing similar injuries "to the general public," as California uniquely permits.  *McGill*, 2 Cal. 5th at 955.

Mr. White alternatively opines that English courts have the power "to grant declaratory relief," under "section 19 of the Senior Courts Act 1981, read together with CPR Part 40.20."  White Decl. ¶51.  The (very short) provisions Mr. White references are submitted herewith as Exhibits D and E to Plaintiffs' RJN, and suffice it to say, they give no indication that English courts are prone to issuing "declaratory relief" to prevent a respondent from causing similar injuries "to the general public." *McGill*, 2 Cal. 5th at 955.  Nor do Defendants or Mr. White explain *why* an English court would declare that a global company must follow the law of a single state in the United States.

### 5.    California Has a Materially Greater Interest in the Determination of the Dispute.

Finally, although left unaddressed by Defendants, California's interest in protecting its residents from products purchased and used in *this state* far outweighs any interest England or Wales may have in the same. *See King*, 393 F. Supp. 3d at 869.

## II.    BOTH DEFENDANTS ARE SUBJECT TO SPECIFIC JURISDICTION IN CALIFORNIA.

Defendants' request to dismiss Plaintiffs' complaint "for lack of personal jurisdiction" is equally unavailing.  Mot. at 12.  The allegations of the CAC establish that Defendants have purposefully availed themselves of conducting business with Plaintiffs and thousands of other California residents, and are thus subject to specific jurisdiction in California.[3]

The Ninth Circuit applies a three-part test to determine whether the exercise of specific jurisdiction over a nonresident defendant is appropriate:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Davis v. Cranfield Aerospace Sols., Ltd.*, __ F.4th __, 2023 WL 4141670, at *4 (9th Cir. June 23, 2023) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004)).    All three factors are met here: (1) Defendants "consummate[d]" thousands of transactions with residents of California, *id.*; (2) Plaintiffs' claims "arise out of" those transactions, *id.*; and (3) it is eminently reasonable to exercise jurisdiction over a global business that annually engages in contract-based transactions with California consumers that exceed $400 million.

---

[3] Defendants spend two pages arguing that they are not subject to general jurisdiction in California, Mot. at 13-14, but Plaintiffs are not proceeding on a theory of general jurisdiction.

CAC ¶¶5, 25.[4]

In contesting specific jurisdiction, Defendants' brief first challenges the second, "arises out of" prong, then challenges the first prong. While confusing, we follow Defendants' order.

### A. Plaintiffs' Claims "Arise Out Of" Defendants' Forum-Related Activity.

Defendants' argument on the second prong is entirely mislaid. They itemize six forms of contact that the CAC alleges FIL has had with California (*e.g.*, having California-based employees, holding "conferences and other meetings in California," selling physical goods in California, etc.) and proclaim that "[n]one of *these* purported contacts relate to Plaintiffs' claims." Mot. at 14-15 (emphasis added). That assertion is true, but it is a red herring. Plaintiffs included *those* allegations in the CAC primarily to show that it would not be unreasonable to hale FIL into California under the third prong.

The question under the second prong is whether Plaintiffs' claim "arises out of or relates to" the forum-related activities that constitute the *first* prong. *Davis*, __ F.4th __, 2023 WL 4141670, at *4. *Those* forum-related activities (*i.e.*, the basis of Plaintiffs' legal claim) are that "Defendants purposefully availed themselves of the benefits of doing business in California by engaging in millions of dollars of business transactions in California," through "enrollment of consumers into the automatically recurring OnlyFans Subscriptions." CAC ¶23. Indeed, the CAC alleges that "Defendants' forum-related activities [are], *namely*, Defendants' unlawful but recurring charges for the OnlyFans Subscriptions." *Id.*

There can be no serious question but that "the claim" Plaintiffs advance

---

[4] The CAC references the statement from FIL's 2021 year-end Annual Report that "gross payments" through the platform reached $4.8 billion in 2021, CAC ¶5, the statement that 70% of that amount originates in the United States, *id.* ¶25, and that California is 12% of this nation's population. *Id.* In other words, $4.8 billion * .70 * .12 = $403 million.

"arises out of or relates to" *those* "forum-related activities." *Davis*, __ F.4th __,
2023 WL 4141670, at *4. Indeed, the entire basis of Plaintiffs' claim is that those
forum-related activities were the means by which Defendants violated the
requirements of the ARL and thus "violated the UCL's unlawful prong." CAC ¶71;
*see also* ¶¶115-18.

The *only* case Defendants cite under the second prong explains that whether a
plaintiffs' injury "arise[s] out of a defendant's forum contacts require[s] 'but for'
causation, in which a direct nexus exists between a defendant's contacts with the
forum state and the cause of action." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496,
504 (9th Cir. 2023) (internal citations omitted, alterations accepted). Here, Plaintiffs
would not have been charged in violation of the ARL and UCL "but for" Defendants
contracting with them and then assessing charges to their cards. It is literally
impossible to conceive of a more "direct nexus" than (A) contracting with someone
and obtaining their billing details, then (B) charging them money according to that
contract and billing information. Indeed, in their prior version of this motion,
Defendants openly proclaimed that "Plaintiffs' claims against Fenix Internet—no
different from their claims against FIL— … could not have arisen without the
Terms." ECF No. 16 at 11. That's what "but for" causation means. Defendants
have deleted that sentence from this iteration of their brief, but their observation is
still accurate.

**B. Defendants Have Consummated Tens of Thousands of Contractual
Transactions with California Residents Over the Last Four Years.**

Defendants mis-describe the first prong, telling the Court that "[s]pecific
jurisdiction exists over a defendant *only when*: (1) the defendant 'purposefully
direct[s] his activities toward the forum.'" Mot. at 14 (emphasis added) (quoting
*AMA Multimedia*, 970 F.3d at 1208). But "purposefully direct" is one of *three* routes
to satisfy the first prong, not the "only" one. Indeed, *AMA Multimedia* itself says
"the defendant must *either* 'purposefully direct his activities' toward the forum *or*

'purposefully avail[ ] himself of the privileges of conducting activities in the forum.'" 970 F.3d at 1208. And as block-quoted *supra*, and repeated by the Ninth Circuit again just last week, the "purposefully direct" route is satisfied where the defendant "purposefully direct[s] his activities *or consummate[s] some transaction with the forum or resident thereof*." *Herbal Brands, Inc. v. Photoplaza, Inc.*, __ F.4th __, 2023 WL 4341454, at *3 (9th Cir. July 5, 2023) (emphasis added).

What distinguishes this case from *every* case Defendants cite is that FIL and Fenix "consummated" tens of thousands of monetary "transactions," *id.*, with Plaintiffs and "at least 10,000" other Californians, CAC ¶103, over the entire four-year limitations period. The number and duration of these contractual relationships is shown by the class representatives' transactional histories. Defendants report that Mr. Muto entered 23 separate month-long transactions with FIL between December 2019 and April 2021. Taylor Decl. ¶¶33-36. Defendants' transaction logs show that Mr. Breeze entered 20 month-long transactions between March 2020 and December 2021. Taylor Decl. Ex. J. John Doe 1 had the fewest, with five month-long transactions between March and September 2022, *id.* ¶¶46-47, and John Doe 2 had the most, with 56 month-long transactions spanning April 2019 to April 2023. *Id.* ¶¶51-52. In other words, an average class member would have entered 26 month-long transactions with FIL in California, over a span of time ranging from 6 months to four years. And Defendant Fenix billed those users for each of these transactions. CAC ¶¶15, 19, 23.

These consummated transactions alone are sufficient to satisfy the first prong. *See, e.g.*, *Wong v. Las Vegas Sands Corp.*, 2022 WL 902419, at *3 (E.D. Cal. Mar. 28, 2022) ("A plaintiff can satisfy the first step of the specific jurisdiction test by showing the defendant 'consummate[d] some transaction with the forum' or its residents"); *Parrella v. Salient Arms Int'l Inc.*, 2020 WL 473794, at *2 (D. Ariz. Jan. 29, 2020) (first prong satisfied where "Reactive purposefully consummated a transaction with a resident of the forum"); *Albertazzi v. Albertazzi*, 2018 WL 457267,

at *4 (D. Nev. Jan. 17, 2018) (satisfied because "it is clear that Defendants consummated a transaction with residents of Nevada").

Here, on the background of tens of thousands of contracts and transactions over four years, where Defendants bill thousands of Californians over $400 million annually, *supra* at 12-13 n.4, it is safe to say that Defendants "'continuously and deliberately exploited [California's] market," and thus "'must reasonably anticipate being haled into [California's] courts' to defend actions 'based on' products causing injury there." *Ford Motor Co. v. Mont Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1027 (2021) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984)).

### 1.    Alternatively, Defendants purposefully availed themselves of the privilege of conducting business in California.

Ninth Circuit caselaw has traditionally drawn a distinction between "purposeful direction," and "purposeful availment," suggesting that the first is "most often used in suits sounding in tort," and the second is "most often used in suits sounding in contract." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Just last month, however, it explained that "a 'rigid dividing line' doesn't serve the purposes of due process," which simply asks "whether defendants have voluntarily derived some benefit from their interstate activities such that they will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Davis*, __ F.4th __, 2023 WL 4141670, at *4 (citation omitted). This is consistent with the Supreme Court's latest word on specific-jurisdiction, which analyzed the plaintiffs' tort claims only as "purposeful availment," where the query was only whether "the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there." *Ford*, 141 S. Ct. at 1025 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

To the extent a meaningful distinction remains between the two, however, Plaintiffs' claims belong to the "purposeful availment" rubric. The Ninth Circuit

emphasized just last week that the "purposeful direction" test "'applies only to <u>intentional</u> torts, not to ... negligence claims." *Herbal Brands*, __ F.4th __, 2023 WL 4341454, at *4 (quoting *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 460 (9th Cir. 2007) (emphasis by *Herbal Brands*)).  While some district courts in California have stated without analysis that UCL claims are analyzed for "purposeful direction," those courts dealt with deceptive conduct under the UCL's "fraud" prong, and thus can be viewed as "intentional torts." *Holland*, 485 F.3d at 460 (citation omitted).  This case, in contrast, concerns only the UCL's "unlawful" prong, CAC ¶115, predicated on Defendants' automatic, continuous, and unlawful charges for the OnlyFans Subscriptions. *Id.* ¶23; *see also Liggett v. Utah Higher Educ. Assistance Auth.*, No. 19-CV-01589-JLS-ADS, 2020 WL 1972286, at *3 (C.D. Cal. Feb. 3, 2020) (analyzing a UCL claim under purposeful availment because the UCL claim there, as here, arose "in connection with an underlying contractual relationship").[5]

Defendants' "specific jurisdiction" arguments are accordingly misdirected, because *every* case they rely upon concerns "purposeful direction."  *See* (in order of appearance) *AMA*, 970 F.3d at 1208 (noting that the claims "sound in tort"); *Dole Food Co. v. Watts*, 303 F.3d 1104, 1109 (9th Cir. 2002) (involving "an elaborate scheme to defraud"); *Caces-Tiamson v. Equifax*, 2020 WL 1322889, at *3-4 (N.D. Cal. Mar. 20, 2020) (analyzing a litigant's "odd" complaint as a tort); *Walden v. Fiore*, 571 U.S. 277, 281 (2014) (section 1983 claims); *In Re Packaged Seafood Products Antitrust Lit.*, 338 F. Supp. 3d 1118, 1148 (S.D. Cal. 2018) ("Courts in this circuit apply the purposeful direction test to antitrust cases."); *Ariix, LLC v. NutriSearch Corp.*, 2022 WL 837072, at *2-5 (S.D. Cal. Mar. 21, 2022) (Lanham Act claim for false advertising by a competitor); *Elliot v. Cessna Aircraft Co.*, 2021

---

[5] Like *Liggett*, per Defendants' own characterization, "Plaintiffs' claims against Fenix Internet—no different from their claims against FIL—are fundamentally grounded in the OnlyFans Terms."  ECF No. 16 at 11.

WL 2153820, at *2 (C.D. Cal. May 25, 2021) ("In cases alleging tortious conduct, such as this one"); *Imageline, Inc. v. Hendricks*, 2009 WL 10286181, at *2 (C.D. Cal. Aug. 12, 2009) ("In actions that sound in tort," as there).

In contrast to Defendants' cases, precedent holds that a party purposefully avails itself of the privilege of doing business in a forum if it "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). Here, Defendants purposefully availed themselves of the privilege of doing business in California by voluntarily contracting with Plaintiffs and over 10,000 other Californians, then consummating tens of thousands of transactions with them, over long periods of time, amounting to over $400 million annually. Precedent has long held that a defendant purposefully avails itself of a forum if it creates "continuing relationships and obligations" with citizens of the state. *Travelers*, 339 U.S. at 647. The "quality and nature" of Defendants' relationship to California residents can in no sense be viewed as "random," "fortuitous," or "attenuated." *Burger King*, 471 U.S. at 480.

*Starlight International, Ltd. v. Lifeguard Health, LLC*, and the cases it relies on provide a perfectly analogous roadmap. 2008 WL 2899903 (N.D. Cal. July 22, 2008). There, the court found purposeful availment where an internet business "made $2,559 of sales to California customers via its website over thirteen months." *Id.* at *6. The court rejected the notion that an online company must "'target' California consumers in particular" to avail itself of the privilege of conducting business in California. It noted that the Ninth Circuit has relied on the "sliding scale" approach applied in other cases, under which "'[a]t one end of the spectrum [when specific jurisdiction is proper] are situations where a defendant clearly does business over the Internet [while at] the opposite end [when specific jurisdiction is improper] are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions.'" *Id.* at *5 (citing *Cybersell,*

OPP. TO MOT. TO DISMISS CAC
CASE NO. 5:22-CV-02164-SSS-KK

*Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir.1997) and quoting *Zippo Mfg. Co. v.
Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1123-24 (W.D. Pa. 1997) (alterations by
*Starlight*)).  The *Starlight* court then cited *Stomp, Inc. v. NeatO, LLC*, 61 F. Supp.
2d 1074 (C.D. Cal. 1999), distilling the principle that where a defendant's "website
was not passive, but interactive, had generated actual sales to California consumers,
[it had] therefore established sufficient minimum contacts to invoke personal
jurisdiction in California."  *Id.* at *5; *see also Boschetto*, 539 F.3d at 1018
(recognizing the continuing validity of the sliding-scale approach "where the contact
under consideration is the website itself").

As to Fenix, there can be no doubt that it "performed some type of affirmative
conduct which allows or promotes the transaction of business within [California]."
*Boschetto*, 539 F.3d at 1016.  Defendants' own filing avers that Fenix "performs
payment processing and provides administrative support services for FIL."  Mot. at
3.  Defendants do not contend that this "payment processing" is done only for *non*-
California transactions.  Indeed, the implication is that the "payment processing"
includes the very payments that Plaintiffs and the class made to Defendants, which
are the heart of this claim.  Accordingly—and because Defendants' arguments as to
Fenix are also directed at the incorrect "purposeful direction" test—Defendants' own
admissions establish sufficient contacts to California to satisfy the proper availment
test.

## III.    PLAINTIFFS' ALLEGATIONS ESTABLISH THEIR STANDING.

The Court can give short shrift to Defendants' challenge to Plaintiffs'
standing. Mot. at 18-21. Here again, Defendants rely on the wrong precedent.  They
say that "Plaintiffs must show 'actual reliance'" for UCL standing, Mot. at 18, but
the case they cite deals with "false advertising and misrepresentations."  *Moore v.
Mars Petcare US*, Inc., 966 F. 3d 1007, 1020 (9th Cir. 2020).  But "[u]nder the
UCL's unlawful prong, a plaintiff must show actual reliance only if the unlawful
conduct is based on fraud or misrepresentation[.]"  *Vargas v. JP Morgan Chase*

*Bank, N.A.*, 30 F. Supp. 3d 945, 953 (C.D. Cal. 2014); *see also Marasigan v. MidFirst Bank*, 2023 WL 3470128, at *7 (S.D. Cal. May 15, 2023) (same). Plaintiffs' claim is based only on Defendants' unlawful violations of the ARL, not fraud or misrepresentation.

Plaintiffs' allegations detail how they "lost money" from Defendants' conduct. They each allege that they suffered damages in the form of automatic renewal fees as a result of Defendants' failure to advise them of the default auto-renewal feature clearly and conspicuously, failure to obtain their affirmative consent, failure to send them the post-transaction acknowledgment advising them of the same, in violation of California law. CAC ¶¶79, 83, 86-90, 93-97. Moreover, they all specifically allege that they would not have lost money had Defendants made the clear and conspicuous disclosures and post-subscription acknowledgments required by the ARL. *Id.* And John Doe 2 specifically alleges he would not have lost money had Defendants complied with the ARL's cancellation requirements. *Id.* ¶96. These allegations are sufficient to establish that they "lost money" "as a result of" Defendants' unlawful renewals. Cal. Bus. & Prof. Code § 17204.

Defendants nevertheless claim that "Plaintiffs' full transaction histories" "show that Plaintiffs already knew of the automatically renewing nature of their OnlyFans subscriptions," and assert that Plaintiffs thereby lack standing. Mot. at 18. There are two major problems here. First, Defendants cite no authority suggesting that such "knowledge" immunizes a defendant from liability under the "unlawful" prong of the UCL in an ARL enforcement action, or eliminates a plaintiff's standing. After all, clear and conspicuous disclosures at the time of the transaction, affirmative consent, a confirming email sent afterward, and a prominently located cancellation button all serve the additional salutary purpose of *reminding* a user that their subscription will renew if not timely canceled. Second, Defendants' argument is based on the *inference* that Plaintiffs canceled prior subscriptions because they knew it would renew, not, for example, because they found that they didn't care for the

creator's content.  Defendants cite two cases for the proposition that courts are permitted to consider extrinsic evidence on standing challenges, Mot. at 19 n.6, but they cite no authority suggesting that a court can then choose among the competing *inferences* that might be drawn from that evidence.  *Cf. Riggins v. Bank of Am., N.A.*, No. 12-CV-0033-DOC, 2013 WL 319285, at *9 (C.D. Cal. Jan. 24, 2013) ("construing all inferences in Plaintiff's favor, Plaintiff has alleged facts sufficient to show statutory UCL standing.").  Even then, Defendants' argument as to John Doe 1, in particular, makes no sense.  They acknowledge that he complains of the auto-renewals for his very *first* OnlyFans subscription, and note that "following that subscription," he timely canceled others, which "undermines any claim of harm." Mot. at 21.  But that just proves that John Doe 1 was unlawfully billed, and suggests that he learned his lesson from that experience, not that the initial series of unlawful charges didn't harm him.

## IV.    PLAINTIFFS HAVE STATED A CLAIM AGAINST FENIX INTERNET.

Defendants' final argument is that the CAC fails to state a claim against Fenix "because Plaintiffs do not plead any facts showing that Fenix Internet has violated the UCL or ARL," and Fenix "is not responsible for the representations or disclosures that do or do not appear on the platform."  Mot. at 22.  Curiously, this section of Defendants' brief does not cite a *single* authority to support its argument that Fenix cannot be liable under the UCL for violating the ARL.

The statutes themselves, however, show that Fenix is a proper defendant. Under the ARL "[i]t is unlawful for any business" to, *inter alia*, "[c]harge the consumer's credit or debit card … for an automatic renewal" without having complied with the substantive requirements of the ARL.  Cal. Bus. & Prof. Code § 17602(a)(2).  Plaintiffs allege that, acting jointly with FIL, Fenix is the entity that "charges consumers for the OnlyFans Subscriptions," and they provide details showing how the charges that Fenix initiates are reflected on users' credit card

statements.  CAC ¶¶19-20.[6]  Since Fenix is the business that initiates the charges, it has engaged in "unlawful" conduct under section 17602(a)(2) of the ARL.

Similarly for the UCL, courts are permitted to "make such orders or judgments … to prevent the use or employment by any person of any practice which constitutes unfair competition … or as may be necessary to restore to any person in interest any money … which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.  According to Plaintiffs' allegations, Fenix "employ[s]" "unfair competition" when it charges users' cards in contravention of section 17602(a)(2) of the ARL.  CAC ¶19.  And according to Plaintiffs' allegations, Fenix is in possession of money "acquired by means of" that unfair competition.  *Id.* So it is among the entities that the Court can order to "restore" that money to its rightful owners.  Cal. Bus. & Prof. Code § 17203.

## CONCLUSION

The Court should deny Defendants' motion to dismiss the CAC.

---

[6] Although a Defendant obviously cannot rely on its own testimonial evidence to support its Rule 12(b)(6) motion, we note that Defendants seemingly agree with the allegation, attesting that "Fenix Internet collects from third-party processors payments made by Fans."  Taylor Decl. ¶6.

Dated:  July 13, 2023

GAW | POE LLP

By:  s/ *Mark Poe*

 Mark Poe

*Attorneys for Marcelo Muto and Noah Breeze*

ZIMMERMAN REED, LLP
Caleb Marker (BAR NO. 269721)
Christopher Nagakawa (BAR NO. 207433)
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel: (877) 500-8780
caleb.marker@zimmreed.com

Hart L. Robinovitch (*pro hac vice*)
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Tel: (480) 348-6400
hart.robinvotich@zimmreed.com

Zachary J. Freese (*pro hac vice*)
80 S. South 8th Street, Suite 1100
Minneapolis, MN 55402
(612) 341-0400
zachary.freese@zimmreed.com

*Attorneys for John Doe 1 and John Doe 2*

OPP. TO MOT. TO DISMISS CAC
CASE NO. 5:22-CV-02164-SSS-KK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief
contains 6,973 words, which complies with the word limit of L.R. 11-6.1.


Dated: July 13, 2023                          GAW | POE LLP


                                              By:    s/ *Mark Poe*
                                                     Mark Poe